557 P.2d 1095

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Raymond "Topper" HAMILTON,
Defendant-Appellant.**

No. 10890.

Supreme Court of New Mexico.

Dec. 13, 1976.

Jan A. Hartke, Chief Public Defender, Reginald J. Storment, Appellant Defender, Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., Raymond Hamilton, Anthony Tupler, Asst. Attys. Gen., Sante Fe, for plaintiff-appellee.

OPINION

McMANUS, Justice.

Defendant was charged in a two-count indictment for the April 3, 1975 murders of his ex-wife, Janie Canales Hamilton (hereafter "Janie") (Count I) and her mother, Juanita Canales (hereafter "Mrs. Canales") (Count II), pursuant to § 40A–2–1A, N.M.S.A.1953 (2d Repl.Vol. 6, 1972).

Hamilton and Janie were married in May 1974. The marriage was stormy and the defendant and Janie later separated. On the evening of April 2, 1975, the couple met to discuss arrangements concerning their child. Subsequently a disagreement developed and Janie filed a complaint against Hamilton with the local police. The police did not pick up the defendant that night.

Shortly after 6:00 a.m. on April 3, 1975 the defendent went to his father's house, where he was living at the time, and took his father's .308 rifle. He then wrote a note which he claimed was a suicide note, but which the State contended was a suicide-homicide note. Hamilton walked to the Canales' home and waited across the street. At 7:00 a.m. he saw Mr. Canales leave for work and shortly thereafter Janie crossed the street to a neighbor's house to use the phone because the telephone line at the Canales' house had been cut. Janie telephoned the police and asked them to check the neighborhood to see if Hamilton was around. As Janie left the neighbor's house the shooting began, which resulted in the death of Janie and Mrs. Canales and the wounding of Hamilton.

Hamilton contends that Mrs. Canales came out of her house and shot at him with a .38 revolver, then fired a second shot after he retrieved his rifle from the ground. Hamilton testified that he then fired an accidental shot down the street from his rifle, and tried to run away from Mrs. Canales. In his attempt to escape, the defendant testified that he dived through the picture window of the Canales house

into the living room. Inside the house Mrs. Canales fired at him again, missed, and Hamilton shot at her, and missed. Mrs. Canales then fired again, hitting Hamilton in the shoulder, and he fired at her, his bullet piercing her abdomen and inflicting a mortal wound. Hamilton denied any knowledge of how Janie had been shot.

The State's evidence was quite different and indicated that Mrs. Canales' first shot had been in the air, not directed toward the defendant, that Hamilton ran after Janie and fired at her and dived through the window after both Janie and Mrs. Canales had retreated into the house. Then those outside heard an indistinguishable volley of shots.

When the police arrived, they found Janie and Hamilton lying wounded in the kitchen and Mrs. Canales lying on the front porch. A search of the defendant's pockets revealed the note he had written. All three victims were taken to the hospital, where Janie and Mrs. Canales subsequently died of their wounds. Hamilton suffered a collapsed left lung, from which he recovered.

Defendant was found guilty by a jury on both counts of the indictment and sentenced to death. An order of April 5, 1976 stayed execution pending this appeal.

The issues raised on this appeal are:

POINT I: The imposition of the sentence of death for the crime of first degree murder under the law of New Mexico violates the Eighth and Fourteenth Amendments.

POINT II: The trial court erred in denying defendant's motion for a mistrial based on the improper question by the prosecutor regarding the defendant's post-arrest silence.

POINT III: The court erred in instructing the jury on "transferred intent" murder, where the defendant was not charged under that theory, and where the evidence did not support giving the instruction.

POINT IV: The trial court erred in responding to certain questions put by the jury, because the questions dealt with issues not properly before the jury, and because the answers given were incorrect and usurped the function of the jury.

POINT V: The trial court erred in instructing the jury that it could convict the defendant of first degree murder upon a finding of implied malice.

POINT VI: The trial court erred by misinstructing the jury on the essential elements of second degree murder.

POINT VII: The trial court erred in its instructions to the jury on self defense.

POINT VIII: The accumulation of errors in the instructions constitute reversible error.

■ Point I was answered in *State v. Rondeau*, 89 N.M. 408, 553 P.2d 688 (1976). The appropriate sentence for first degree murder is now life imprisonment.

In Point II defendant claims that there was an improper comment on the exercise of his constitutional right to remain silent. During direct examination of State's witness Axline, the following question and answer were recorded:

Q. But he did not make any statement to you concerning the incident of the offense; is that correct?

A. No sir. I asked him if he wished to have an attorney and he advised me he did not. And I asked him if he wished to talk to me and he said "No. I don't want to talk to you."

Witness Axline further testified that she had given Hamilton the proper Miranda warnings.

Relying on *State v. Lara*, 88 N.M. 233, 539 P.2d 623 (Ct.App.1975), defendant asserts the statement by the witness was prejudicial and that the defense counsel's motion for mistrial should have been granted. In *Lara* the State's attorney posed a question directly commenting on defendant

Lara's failure to provide information after being advised of his Miranda rights.

Such is not the situation in the case at bar. In Lara the defendant remained silent, here he did not. Defendant stated that he did not want to talk to Officer Axline. *State v. Olguin*, 88 N.M. 511, 542 P. 2d 1201 (Ct.App.1975) is more appropriate. In *Olguin* the court rejected the *Lara*-based contention that the prosecutor's question was an improper comment on Olguin's silence because Olguin had made an affirmative statement which was contrary to his testimony during the trial.

■ Hamilton's refusal to talk to Axline was not an exercise of his right to remain silent, but rather a statement specifically directed toward her. Shortly afterward the defendant requested to talk to Detective Schulz whom he recognized. Hamilton then confessed to Schulz. The facts indicate that the defendant knew and trusted Schulz and that Hamilton preferred to talk to Schulz and not to Officer Axline. Under these circumstances, Axline's testimony concerning Hamilton's statement was not a comment on his right to remain silent. As the trial judge stated:

> In the first place, in the case at bar, the fact that the defendant declined to make a statement to Mrs. Axline was not solicited by the State but was altogether volunteered by the witness. In the second place, the witness did consequently make a statement to another officer and he did not state flatly that he would not make a statement. He simply stated that he did not wish to talk to Mrs. Axline.

We agree that this response was not improper.

In Point III the error claimed is based on the court's instruction regarding transferred intent. The defendant contends that this instruction was improper because "transferred intent" murder was not charged in the indictment and there was insufficient evidence to support that theory. We do not agree.

■ The defendant was indicted on an "open" charge of murder and contends that since he was not charged under the specific transferred intent subsection that the instruction on that theory was improper. The defendant misapprehends the nature of this theory. Transferred intent is merely the doctrine that allows the elements of malice or intent to be demonstrated when an "innocent" non-original victim is killed. *State v. Carpio*, 27 N.M. 265, 199 P. 1012, 18 A.L.R. 914 (1921). Therefore, it is not necessary to charge the defendant with transferred intent because the indictment specifically informed the defendant of the crime and what he must be prepared to meet. *State v. Cutnose*, 87 N.M. 307, 532 P.2d 896 (Ct.App.), cert. denied, 87 N.M. 299, 532 P.2d 888 (1974). Cf. *State v. Hicks*, 89 N.M. 568, 555 P.2d 689 (filed October 26, 1976).

This Court long ago adopted the theory of "transferred intent" whereby the elements of premeditation and malice directed against an intended victim are transferred or flow from the prepetrator to the actual victim. *State v. Carpio,* supra. In *Carpio* the defendant intended to kill Lucero but instead killed Rios, a bystander. The Court held that the malice directed at Lucero followed the bullet and was transferred to Rios. See *State v. Ochoa*, 61 N. M. 225, 297 P.2d 1053 (1956); *State v. Wilson*, 39 N.M. 284, 46 P.2d 57 (1935); *Gladden v. State*, 273 Md. 383, 330 A.2d 176 (Ct.App.1974).

■ There was sufficient evidence to permit the jury to conclude that the defendant intended to murder Janie and that he did so act with malice aforethought. This act supplied the necessary elements for first degree murder. The State's theory of the death of Mrs. Canales was that Hamilton did not deliberately shoot at Mrs. Canales but rather that she was hit by a bullet intended for Janie. This was a reasonable conclusion that the jury could have drawn from the evidence, and therefore, this instruction was proper.

In Point IV the alleged assignment of error is based on an answer submitted to the jury. Defendant questions the trial court's response to the second question submitted.

The question and answer are as follows:

2) For "transfer" to apply, must the murder of the "different person" be a result of the same exact act of attempting to harm the original intended victim, or may another act resulting in death of the "different person" taking place in the chain of events cause it to apply?

The court responded:

In answer to your second question, the intent would transfer unless you find as a fact that the defendant acted in self defense as defined in your original instructions.

Defendant states the answer is wrong as a matter of substantive law and that the instruction told the jury that if the unintended victim is killed by any act taking place in the chain of events causing the death of the intended victim that it is transferred-intent murder. If this was an erroneous theory of transferred intent it is cured by a given instruction which states:

When one intends to kill or injure a certain person, and kills a different person, the crime, if any, is the same as though the original intended victim had been killed. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

■■■ This instruction conforms with the doctrine of transferred intent as stated in *State v. Carpio*, supra, and *State v. Ochoa*, supra. Instructions are to be read and considered as a whole and when so considered they are proper if they fairly and accurately state the applicable law. *State v. Rushing*, 85 N.M. 540, 514 P.2d 297 (1973); *State v. Rhea*, 86 N.M. 291, 523 P.2d 26 (Ct.App.) cert. denied, 86 N.M. 281, 523 P.2d 16 (1974). The answer given when considered with the instructions on transferred intent is an accurate statement of the law.

■■■ The next error the defendant alleges is based upon the instructions regarding express and implied malice. Section 40A–2–1, supra, provides that, "Murder is the unlawful killing of one human being by another with malice aforethought, either express or implied * * *" The instructions were worded accordingly; however, a finding of express malice is mandatory to support a conviction of first degree murder, whereas, implied malice is sufficient for second degree murder. *State v. Hicks*, supra; *State v. Vigil*, 87 N.M. 345, 533 P.2d 578 (1975). The statute makes no explicit reference to how this distinction applies to the degrees of murder and unless the instructions as a whole set out this difference, this instruction alone is "incomplete, misleading and constitutes error." *State v. Hicks*, supra. Therefore, we must consider all of the given instructions.

After the challenged instruction concerning malice aforethought come three explanatory instructions given in this case regarding the murder-malice connection. The first explains the degrees of murder and the necessary elements:

Murder is the unlawful killing of one human being by another with malice aforethought, either express or implied, by any of the means with which death may be caused.

A. Murder in the fist degree consists of all murder perpetrated by any kind of willful, deliberate and premeditated killing.

B. Murder in the second degree consists of all other murder perpetrated with an intent to kill or to do great bodily harm.

The second concerns the necessary "evil design" type of intention:

A willful, deliberate and premeditated intention refers to the state of mind of the defendant. A willful, deliberate and premeditated intention may be inferred

from all of the facts and circumstances of the killing. The words willful, deliberate and premeditated means [sic] arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a willful, deliberate and premeditated killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

Deliberate intent has been equated with express malice. *State v. DeSantos*, 89 N.M. 458, 553 P.2d 1265 (1976). The third instruction clearly states the distinction between express and implied malice:

Malice is express malice, when there is the deliberate intention, unlawfully to take away the life of a fellow creature and which is manifested by external circumstances capable of proof.

Malice shall be implied when no considerable provocation appears or when all circumstances of the killing show a wicked and malignant heart.

■ Taking the instructions as a whole, it is apparent that the jury had before it a clear explanation of the relationship between express malice and first degree murder, and implied malice and second degree murder.

This problem should be resolved by the new Uniform Jury Instructions for Criminal Cases, which became effective September 1, 1975. The new instruction on first degree murder N.M.U.J.I.Crim. 2.00, does not use the phrase "malice aforethought either express or implied," but instead discusses "deliberate intention to take away the life of" the victim. We are confident that the confusion raised by the terms "express" and "implied" malice will now be eliminated. See generally Institute of Public Law and Services, Committee Commentary to N.M.U.J.I.Crim. 2.00, New

Mexico Uniform Jury Instructions Criminal Approved Committee Commentaries (1975).

■ In Points VI and VII defendant alleges errors in instructions concerning second degree murder and self-defense. In neither instance was an objection made nor was there a request for any other instruction. An objection to an instruction is necessary to preserve an issue on appeal. *State v. Rodriguez*, 81 N.M. 503, 469 P.2d 148 (1970). Hamilton asserts that the lack of instruction on the essential elements of second degree murder is a fundamental error that may be raised for the first time on appeal. The defendant was convicted of first degree murder upon substantial evidence. An erroneous instruction on second degree murder in this case was harmless and non-prejudicial.

■ In Point VIII the defendant claims that the accumulation of errors in the instructions constitute reversible error. We have stated heretofore that the doctrine of fundamental error resulting from an accumulation of error is to be sparingly and strictly applied:

A review of our precedents discloses that it is rarely applied. In a number of cases it has been argued that although several errors standing alone would not constitute fundamental error, their cumulative effect was that the defendant did not receive a fair trial. Such claims are usually rejected (footnotes omitted).

*State v. DeSantos*, 89 N.M. at 462, 553 P.2d at 1269.

■ The record does not reveal the type of cumulative errors that would change the result in this case.

The defendant's conviction is hereby affirmed. The cause is remanded only for the purpose of sentencing the defendant to life imprisonment.

IT IS SO ORDERED.

OMAN, C. J., and EASLEY, J., concur.